EXHIBIT  1

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO:

|  |  |
|---|---|
| COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH, BROWN BROTHERS HARRIMAN & CO., BANK HAPOALIM B.M, MITSUBISHI INTERNATIONAL CORPORATION, ICBC STANDARD BANK PLC, TECHEMET METAL TRADING, LLC, MERCED PARTNERS LIMITED PARTNERSHIP, ATHILON CAPITAL CORP., LLC, and HAIN CAPITAL INVESTORS MASTER FUND, LTD., | : : : : : : |
| Plaintiffs, | : |
| v. | : |
| EISNERAMPER LLP, | : |
| Defendant. | / |

## <u>COMPLAINT</u>

Plaintiffs Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading, LLC ("Techemet"), Merced Partners Limited Partnership ("Merced") and Athilon Capital Corp., LLC ("Athilon"), as successors to Woodforest National Bank ("Woodforest"), and Hain Capital Investors Master Fund, Ltd. ("Hain Capital"), as successor to Bank Leumi USA ("Leumi"), by and through their undersigned attorneys, for their Complaint against Defendant EisnerAmper LLP ("Eisner"), allege as follows:

## NATURE OF THE CASE

1.      Plaintiffs (or their predecessors in interest) provided secured credit facilities and associated loans and precious metal leases to Republic Metals Corporation ("Republic")[1], a precious metals refiner based in Opa Locka, Florida.  They bring this lawsuit against Republic's former auditor, Eisner, to recover damages caused by the inaccurate clean audit report recklessly issued by Eisner for Republic's 2016 financial statements.  Eisner issued its audit opinion knowing that it would be used and relied upon by Republic's creditors, including Plaintiffs.  The audited financial statements represented that Republic had precious metals inventory valued at $134.8 million.  In fact, the number was a fiction and the true value of Republic's actual inventory was a fraction of that amount.

2.      In conducting its audit, Eisner knew that Republic's inventory valuation was based on nearly 2,000 drums of hydroxide—a refinery byproduct—that purportedly contained millions of dollars of extractable silver and gold.  This inventory was the most significant asset on Republic's balance sheet, representing over 50% of the current assets reported on its 2016 balance sheet.  For an auditor, high-value inventory items always require careful scrutiny, but this is especially so when each unit of inventory—here, a drum of a hydroxide mixture—differs in value, weight, and composition from unit to unit.  But Eisner, evidently lacking the requisite industry knowledge and in derogation of Generally Accepted Audit Standards ("GAAS"), blindly accepted Republic's counts and valuation methodologies at face value, without conducting any independent testing, verification, or other assurance procedures, and without even understanding what Republic was doing. Moreover, in failing to audit inventory, Eisner ignored red flags showing that Republic's inventory values were wildly overstated—including the very fact that Republic was

---

[1] Now known as Miami Metals II, Inc.

sitting on so many unprocessed drums of byproduct of substantial value (over $100 million in precious metals), which it had yet to monetize.

3.      In extending credit to Republic, Plaintiffs relied on Eisner's professional audit opinion, including that Republic's 2016 financial statements fairly presented, in all material respects, Republic's financial position and results of operations and that they were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Neither was true. Had Eisner exercised due professional care and the requisite degree of professional skepticism, the misstatements and errors in Republic's financial statements would have been easily detected.  But Eisner did not conduct an audit in accordance with GAAS.  Indeed, its "audit" of inventory amounted to no audit at all and its procedures were no more thorough than checking arithmetic based on inputs provided by Republic's management.  When an auditor ignores obvious risks and utterly abandons the guidelines and principles that govern the profession, its culpability moves beyond mere negligence to extreme recklessness, and that is how Eisner's performance must be viewed here.

4.      In November 2018, Republic filed for Chapter 11 bankruptcy as a result of what Republic described as "a significant discrepancy in its inventory accounting."  As of that date, Republic owed the Plaintiffs over $177 million under loans and metal leases, which it could not repay.  Of this amount, approximately $135 million remains unpaid as of today and, of that amount, no less than $61.5 million is likely to remain outstanding after expected distributions from Republic's bankruptcy estate are made.

5.      This complaint brings claims for negligent misrepresentation, gross negligence, and common law fraud.

## PARTIES

6.      The Plaintiffs are a group of financial institutions and precious metals lessors that

3

(directly or through their predecessors in interest) extended nearly $200 million in credit to Republic pursuant to certain secured credit and lease agreements.

7.      Plaintiff Rabobank is a foreign branch office of a financial institution incorporated and existing under the laws of the Netherlands with its principal place of business located as 245 Park Avenue, New York, New York 10167.

8.      Plaintiff BBH is a New York limited partnership with its principal place of business located at 140 Broadway, New York, New York 10005.

9.      Plaintiff Hapoalim is a foreign branch office of a financial institution incorporated and existing under the laws of Israel with its principal place of business in the United States located at 1120 Avenue of the Americas, New York, New York 10036.

10.     Plaintiff Mitsubishi is a New York corporation with its principal place of business located at 655 Third Avenue, New York, New York 10017.

11.     Plaintiff ICBCS is a corporation incorporated and existing under the laws of England and Wales with its principal place of business located at 20 Gresham Street, London, EC2V 7JE, United Kingdom.

12.     Plaintiff Techemet is a Texas corporation with its principal place of business located at 6025 Genoa Red Bluff Road, Pasadena, Texas 77507.

13.     Plaintiffs Merced and Athilon purchased Woodforest's rights, claims and privileges associated with Republic's obligations to Woodforest.  Plaintiff Merced is a Delaware limited partnership, and Plaintiff Athilon is a Delaware limited liability company, both maintaining a principal place of business located at 601 Carlson Parkway, Ste. 200, Minnetonka, Minnesota 55305. (Woodforest, is a national banking association with its principal place of business located at 1330 Lake Robbins, Suite 100, The Woodlands, Texas 77380.)

14.     Plaintiff Hain Capital purchased Leumi's rights, claims, and privileges arising in connection with Republic's obligations to Leumi.  Hain Capital is organized under the laws of the Cayman Islands, with its principal place of business located at 301 Route 17, 7th Floor, Rutherford, New Jersey 07070. (Leumi is a New York chartered bank with its principal place of business located at 579 Fifth Avenue, New York, New York 10017.)

15.     Defendant Eisner, is a national public accounting firm with offices around the country, including offices in Fort Lauderdale, West Palm Beach, and at 1001 Brickell Bay Drive, Miami, Florida 33131. It is registered as a limited liability partnership in the State of Florida with the Florida Secretary of State, Division of Corporations, and is licensed as a CPA Firm with the Florida Department of Business and Professional Regulation (License Number AD64074).

## JURISDICTION AND VENUE

16.     This Court has general subject matter jurisdiction because this is a civil dispute involving more than $25,000.  It has personal jurisdiction over Defendant Eisner under Florida's long-arm statute, Fla. Stat. § 48.193, in that Plaintiffs' causes of action arise out of Eisner's engaging in business in the state and from tortious acts and omissions committed within the state. Venue is proper in this Circuit under Fla. Stat. § 47.011, because Eisner resides in Miami-Dade County.

## FACTUAL BACKGROUND

**Republic Metals Corporation**

17.     Republic, incorporated in the State of Florida in 1980, was in the business of refining, selling, and brokering precious metals.  The company was family-owned and was operated by Chief Executive Officer Jason Rubin.  Its Chief Financial Officer was David Comite. Republic acquired minimally processed gold and silver and processed it into finished metal at its refinery located in Opa Locka, Florida.  Both Rubin and Comite worked out of Republic's offices

5

at the refinery site.

18.     In its early days, Republic primarily refined gold, but in 2013 it shifted its focus to silver. The process for refining gold and silver is not the same.  Gold refining involves melting, whereas silver refining is mainly a chemical process. Moreover, the silver refining process takes longer, and the process involves a much larger volume of raw materials. A byproduct from the silver refining process is a hydroxide sludge, which contains the remnants from the refining process, mainly water, copper, and various quantities of precious metals that were not extracted through the main refining process.

19.     As Republic ramped up its silver refining operations, it generated substantial quantities of the hydroxide byproduct, which it stored in drums (numbering nearly 2,000 in 2016). These drums of hydroxide sludge were reported in aggregate on Republic's balance sheet as inventory and represented the single largest asset for each year.

20.     Republic obtained working capital for its operations through precious metal leases and loans provided under the Intercreditor credit facilities further described below.  These credit facilities were secured by Republic's purported precious metals inventory.

**Eisner's Negligent Audit of Republic's Precious Metals Inventory**

21.     Republic's 2014 and 2015 financial statements were audited by Crowe Horwath LLP ("Crowe").  Crowe performed its audit functions negligently and failed to discover that Republic's inventory value was wildly overstated.[2]

22.     In October 2016, Republic fired Crowe and engaged Eisner to audit its 2016 financial statements.  Eisner's engagement agreement, dated December 2, 2016, was signed by

---

[2] Plaintiffs sued Crowe in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida. Crowe removed the case to the United States District Court for the Southern District of Florida and sought to transfer the case to the Southern District of New York; Plaintiffs moved to remand. The transfer motion was granted and the abstention/remand motion is sub judice in the federal court in New York.

Eisner partner Travis Epp and addressed to Republic's CFO Comite at Republic's offices in Florida, where Comite signed the engagement agreement.

23.     In mid-April 2017, Eisner's audit personnel visited Republic's Florida offices for an on-site inspection and to begin the 2016 year-end audit. In connection with that visit, Republic provided Eisner with a trial balance showing an inventory value of $134,455,218.96.

24.     Before Eisner's visit, Republic had supplied Eisner with a "narrative," which purported to explain its inventory processes. Republic claimed to maintain a "perpetual inventory system," which it tracked through its software system and verified with physical counts. The narrative also identified four categories of inventory, of which three contained precious metals: "The vault" (finished goods), "Bars inventory" (metals yet to be refined), and "Sweeps" (byproducts stored in "large drums" that contain "low grade materials"). The other inventory category (not relevant here) was "Diamonds."

25.     In designing and conducting its audit procedures, Eisner should have made inventory a major focus. It is well known that fictitious inventory has been at the center of numerous significant cases of fraudulent and misstated financial reporting. As a general matter, under GAAS, observation and verification of inventory counts are mandatory components of an audit, and the valuation of inventory is always a key part of an audit because of its materiality and the high risk of errors or misstatements.  At Republic, further scrutiny was required because its reported inventory value represented such a large proportion of the overall value of the current assets on the balance sheet.  From an audit perspective, inventory at Republic presented a significant risk of material misstatement and, thus, required an appropriate audit response.

26.     On April 18, 2017, Republic provided Eisner with accounting work papers, including a chart entitled "December 2016 INVENTORY." The chart purported to breakout

inventory by type (*e.g.*, Gold, Silver, Platinum, Palladium, *etc.*) and to classify it according to its category (*e.g.,* Vault, Bars, Sweeps, and Refinery). The largest component of inventory by weight and value was silver in the refinery (7,753,042.96 troy ounces valued at $125,909,417.67 (as of 12/31/16)), a category that was not described in Republic's inventory narrative.

27.     On April 19, 2017, Republic supplied Eisner with separate spreadsheets, corresponding to each of the precious metal inventory categories described in the inventory narrative. These spreadsheets were named: "December Bars Inventory.xlsx," "December Sweeps inventory.xlsx," and "December Vault Inventory.xlsx," and they reported the precious metal contents held by Republic for each category.  However, the combined weights of the precious metals shown on the three charts were a fraction of the total quantities necessary to support the $134,455,218.96 inventory value reported on Republic's trial balance.

28.     To close the substantial gap between the value of the precious metals calculable from Republic's "bars," "sweeps," and "vault" inventory charts and the $134 million value on the trial balance, on April 25, 2017, Republic's CFO, Comite, provided Eisner with another chart entitled "au-ag refinery calculation." According to the "au-ag refinery calculation," Republic estimated that its "refinery" inventory contained an additional 29,550 troy ounces of gold (worth $34 million at year end 2016 prices) and 6,304,000 ounces of silver (worth $102,376,960 at year end 2016 prices), which were stored in 1,973 drums of hydroxide sludge. The quantities shown on the "au-ag refinery calculation" were not based on actual inventory counts but were estimates derived from historical data.  In fact, the calculations were bogus, and the quantities did not exist.

29.     Incredibly, despite the materiality of the inventory values at issue, the significant risk of misstatement, the numerous testing requirements under GAAS for inventory specifically and significant balance sheet items generally, and the auditor's general duty of skepticism, Eisner

performed no audit procedures to test or verify Comite's "au-ag refinery calculation." Instead, it relied entirely on the say-so of the CFO of the company that it was auditing.

30.     Eisner did not even physically inspect or count the drums. Comite obtained (and forwarded to Eisner) an email from an employee in Republic's wastewater processing facility, who reported on February 17, 2017 that "We have a total of 1,973 drums of high grade hydroxides left." Eisner accepted that figure as accurate without verifying it.

31.     Despite being required to do so under GAAS,

    **(a)**     Eisner did not observe, conduct or verify a physical inventory count of the drums of hydroxide;

    **(b)**     Eisner did not observe or weigh the hydroxide drums or a random sample to verify that the weights in inventory matched the weights from the historical lots shown on the "au-ag refinery calculation";

    **(c)**     Eisner did not test the contents of the hydroxide drums or a random sample of the drums to verify their supposed precious metal contents;

    **(d)**     Eisner did not ascertain the cost or feasibility of extracting the gold and silver from the hydroxide;

    **(e)**     Eisner did not ascertain or verify that the hydroxide sludge could or would be refined and sold within one year or that it was to be sold or consumed within the normal operating cycle, which are the characteristics of a "current" asset;

    **(f)**     Eisner did not investigate or validate Republic's method for valuing the inventory of hydroxide sludge based on prior data shown on the "au-ag refinery calculation";

    **(g)**     Eisner did not obtain a sufficient understanding of the derivation and meaning of the historical data on the "au-ag refinery calculation:" and

9

(h)     Eisner did not inquire why the drums of "high grade hydroxides," which were now the largest component of Republic's inventory, were not even listed in Republic's inventory "narrative."   The only "drums" identified in the narrative were those included in "sweeps" and were described as containing "low grade materials."

32.     Had Eisner performed even one of the above-listed procedures, it would have immediately recognized that Comite's inventory valuation methodology was flawed and unreliable:

(a)     First, had Eisner required an independent valuation of the hydroxide barrels or a statistically appropriate sample, it would have ascertained that they had little or no value. This type of testing is easily done and is a standard procedure for an auditor.

(b)     Second, had Eisner investigated Republic's valuation methodology, it would have easily determined its invalidity. Republic's methodology valued current inventory by extrapolating from purported historical data. But it was an apples-to-oranges comparison. The majority of the *current* inventory of hydroxide sludge was created at the end of the refining process (in the wastewater process), after virtually all the valuable materials had been refined out.   By comparison, the *historical* data on the "au-ag refinery calculation" was based on precious metal recoveries obtained from byproducts during the main refining process when larger amounts of valuable materials were present. Also, the current inventory was valued on a per-drum basis. By comparison, the historical data in the "au-ag refinery calculation" included lots that aggregated multiple drums (all of variable weights) collected over weeks or months of refining.

(c)     Third, had Eisner questioned Comite about the historical data set on the "au-ag refinery calculation," it would have instantly recognized that it was not a reliable basis for estimating current inventory values. The descriptions of the lots in this historical data refer to "pre-

precip" or "pre-precipitation." Eisner should have inquired whether the current inventory of hydroxides was "pre-" (when silver content is extremely high) or "post-" (when it is extremely low) precipitation—it was the latter. The descriptions in the data also contain date ranges for each clean up bar (which was the nomenclature and numbering system used on the chart to describe each lot). The ranges differed: some were collected in one month; others were collected over several months. As a result, the weights varied dramatically (a low of 40 pounds to a high of 1,500 pounds). The variability should have alerted Eisner to the plain fact that the "clean up" bars shown on the chart did not equate to a single 55-gallon drum and that it was unreasonable to assume, without any testing or independent validation, that the 1,973 drums in current inventory had the same average weight as the 160 line-item clean-up bars on the "au-ag refinery calculation" chart.

(d)     Fourth, had Eisner conducted a physical inspection of the drums, their storage, and Republic's record keeping, which could have been done easily and is required under GAAS, it would have observed that Republic's inventory controls, storage methods, and tracking methodologies were insufficient and unreliable.

(e)     Finally, an auditor reasonably knowledgeable in the industry, as Eisner was required to be, would have known that it was implausible that a refinery would hold nearly two thousand drums of hydroxide sludge, generated as byproducts of the refining process, with the average drum containing precious metals worth more than $69,000.  Indeed, it is known in the industry (and disclosed in the Republic's own inventory narrative) that a refiner often pays others to dispose of these materials as they contain insufficient value to justify the cost of storage and extraction.

33.     On May 30, 2017, Eisner issued a clean audit opinion for Republic's financial statements for the fiscal year ending December 31, 2016.

34.      In its audit opinion, Eisner stated that it had conducted its audit of Republic "in accordance with auditing standards generally accepted in the United States of America", which it summarized as requiring it to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement." Eisner assured that in issuing its opinion it had obtained "audit evidence" that was "sufficient and appropriate to provide a basis" for its "audit opinion."

35.      With its assurance of having followed GAAS and of having obtained sufficient audit evidence to support its audit opinion, Eisner concluded: "In our opinion, the combined financial statements referred to above present fairly, in all material respects, the financial position of Republic Metals Corporation and Affiliates as of December 31, 2016, and the combined results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America."

36.      In issuing a clean audit opinion for Republic's financial statements for 2016, Eisner breached the duty of care to which accounting professionals are held in conducting independent audits.  Eisner's auditors had insufficient knowledge of the industry and of the specific inventory that they were auditing to evaluate the information provided by Republic; they failed to conduct appropriate inquiries or obtain sufficient audit evidence to support the inventory valuation; they failed to obtain advice from an industry expert on how to value the hydroxides; they failed to follow an auditor's duty of skepticism; they failed to ensure that Republic had adequate accounting controls in place for inventory; all despite the materiality of the inventory at issue and the red-flag warnings that Republic's information and representations were false.

37.      As a direct result of these failures, Eisner issued its clean audit opinion for Republic's financial statements for the year ended December 31, 2016, even though the balance

sheet falsely reported an inventory value of $134.8 million (of which $113.8 million was described as silver inventory), mainly consisting of the purported precious metal contents of the drums of hydroxide sludge, which were worth only a small fraction of that amount.

38.    Eisner's failures as an auditor were not detected until 2018, in connection with the preparation of the year-end financial statements for 2017. For the 2017 financial statements, Republic's CFO, Comite, decided to recompute Republic's "refinery" inventory based on a lower per-barrel valuation. Reducing inventory instantly created a loss for 2017 (lower ending inventory means higher "costs of goods sold"). The revaluation and loss raised significant questions with Republic's secured creditors.

39.    On June 8, 2018, Republic hired Eisner to conduct a forensic analysis of its inventory and to advise regarding the discrepancies. Specifically, Eisner's forensic team was hired to attend a physical inventory count (occurring on June 9-11, 2018) and compare the inventory weights observed to Republic internal reports, which had been the basis for the financial statements' reported inventory figures.

40.    Although Eisner's work done in June 2018 was nominally "forensic" and on a "consulting" basis, in fact, Eisner did in 2018 what it should have done for the 2016 year-end audit. Its 2018 "forensic" objective, to understand Republic's inventory processes and count the inventory, is indistinguishable from what should have been its "audit" plan and objective a year prior.

41.    The conclusion of the forensic team was inevitable: Eisner was able to reconcile Republic's finished inventory and other observable components of inventory but was forced to exclude the "hydroxide barrels stored in the Warehouse," from the calculation. As to them, Eisner observed that they "required further refining" before a value could be assigned. It noted that the

hydroxide barrels were unlabeled and untested, and it directed that Republic "process a selection of barrels that we randomly select to identify the actual metal content."

42.    To summarize its finding, Eisner's forensic team produced the following inventory summary for inventory value as of June 2018 – with the line item for "Warehouse (Hydroxide Barrels)" blank ("**TBD**") because the value could not be determined:

**Exhibit 1 –Summary of Inventory Findings by Weight and Estimated Value as of June 8, 2018:**

| EisnerAmper Summary of Inventory Findings | Gold | | Silver | | Other | Total Value |
|---|---|---|---|---|---|---|
| | Weight Oz | Value | Weight Oz | Value | Value | |
| 1 Refinery (excluding Hydroxide Barrels | 24,339 | $ 31,640,925 | 1,001,385 | $ 16,823,263 | $ 1,546,032 | $ 50,010,219 |
| 2 Warehouse (Hydroxide Barrels) | | | | TBD | | |
| 3 Mint | 3,450 | $ 4,485,000 | 299,873 | $ 5,037,859 | | $ 9,522,859 |
| 4 Sweeps | 6,464 | $ 8,402,628 | 81,363 | $ 1,366,905 | $ 2,748,306 | $ 12,517,839 |
| 5 Bars | 11,555 | $ 15,021,268 | 1,099,538 | $ 18,472,246 | $ 2,161,213 | $ 35,654,728 |
| 6 Third Party Advances & In-Transit | 20,647 | $ 26,840,691 | 453,696 | $ 7,622,087 | $ 483,230 | $ 34,946,008 |
| 7 Vault | 7,128 | $ 9,266,876 | 534,990 | $ 8,987,825 | $ 481,122 | $ 18,735,823 |
| 8 Miscellaneous Inventory | 2,510 | $ 3,262,630 | 90,820 | $ 1,525,778 | $ 648,634 | $ 5,437,042 |
| **Total Inventory** | **76,092** | **$ 98,920,017** | **3,561,664** | **$ 59,835,963** | **$ 8,068,537** | **$ 166,824,518** |
| 9 Cash Assets & Deposits | | | | | | $ 15,749,156 |

| | |
|---|---|
| Total Inventory (per above) | $ 166,824,518 |
| Cash Assets & Deposits | $ 15,749,156 |
| Total Inventory, Cash & Deposits | $ 182,573,674 |
| Bank Obligations | $ 173,198,067 |
| Difference | $ 9,375,607 |

**The Lenders' Reliance on Eisner's Audits**

43.    From December 2014 on, Republic funded its working capital needs by drawing on credit facilities governed by an Intercreditor Agreement between Republic and a group of financial institutions and precious metals lessors, who are either Plaintiffs here or their predecessors in interest (collectively, the "Lenders").

44.    The Intercreditor Agreement provided the common framework for the Lenders to extend secured credit facilities to Republic in the form of cash loans and precious metals leases. The Intercreditor Agreement defined a common borrowing base for the Intercreditor facilities and required Republic to provide a Borrowing Base Report at regular intervals.   The Intercreditor Agreement defined the borrowing base as "an amount equal to the sum of certain asset categories of [Republic] (principally accounts receivable and inventory)."   The Intercreditor Agreement also

enabled the Lenders to share equally in all collateral securing Intercreditor facilities and in all recoveries obtained by any Lender.

45.     The Intercreditor Agreement contemplated that some Lenders would potentially terminate their participation in the Intercreditor group and that others would join from time-to-time.  It provided expressly that "[a]ny bank or financial institution which is not a party to this Agreement initially may, with the consent of each of the other [Lenders], become a party hereto and hereafter be deemed a [Lender] hereunder."

46.     The Intercreditor Agreement was amended from time to time, including in February 2016, but at all relevant times contained the provisions discussed in paragraphs 44 and 45.

47.     Plaintiff Mitsubishi was a party to the Intercreditor Agreement from December 2014 and provided Intercreditor credit facilities by leasing gold and silver to Republic.

48.     Mitsubishi received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statements in continuing to execute leases of gold and silver to Republic, pursuant to the Intercreditor credit facilities.  At the time of Republic's bankruptcy petition, Republic owed Mitsubishi approximately $54,278,000 under the Intercreditor Agreement metal leases.

49.     On February 19, 2016, the Intercreditor Agreement was amended and restated to, among other things, add Plaintiff Hapoalim as a party.  It was a requirement of the Hapoalim credit facility that Republic provide the bank with copies of its annual audited financial statements within 150 days of the close of each fiscal year, "prepared by independent public accountants reasonably acceptable to the Bank."

50.     Hapoalim received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statement in continuing to lend money and extending the maturities of existing loans to Republic pursuant to the Intercreditor credit facilities. At the time of Republic's bankruptcy

petition, Republic owed Hapoalim approximately $11,373,000 in Intercreditor Agreement loans.

51.     On March 24, 2016, Plaintiff ICBCS became a party to the Intercreditor Agreement.

52.     ICBCS received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statements in continuing to lease metal to Republic pursuant to the Intercreditor credit facilities.  At the time of Republic's bankruptcy petition, Republic owed ICBCS approximately $20,034,000 under Intercreditor Agreement metals leases.

53.     On June 24, 2016, Plaintiff BBH became a party to the Intercreditor Agreement and extended credit facilities to Republic.  It was a requirement of the BBH credit facility that Republic's annual financial statements be "audited by Crowe Horwath or a firm acceptable to the Bank" and provided to BBH within 150 days of the end of each fiscal year.

54.     BBH received, reviewed, and relied on Eisner's audits of Republic's 2016 financial statements in continuing to lend money to Republic pursuant to the Intercreditor credit facilities. At the time of Republic's bankruptcy petition, Republic owed BBH approximately $9,098,000 under Intercreditor Agreement loans.

55.     On June 27, 2017, Plaintiff Rabobank became a party to the Intercreditor Agreement and executed a credit facility with Republic.  It was a requirement of the credit facilities that Republic deliver copies of its audited financial statements to Rabobank within 150 days of the fiscal year end.

56.     Rabobank received, reviewed, and relied on Eisner's audit of the Republic's 2016 financial statements in entering into Intercreditor credit facilities with Republic and in lending money to Republic pursuant to these credit facilities.  At the time of Republic's bankruptcy petition, Republic owed Rabobank approximately $31,730,000 under Intercreditor Agreement loans.

57.     On June 27, 2017, Plaintiff Techemet became a party to the Intercreditor Agreement and entered into metal leasing agreements with Republic.  It was a requirement of the agreements that Republic deliver copies of its annual audited financial statements to Techemet.

58.     Techemet received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statements in executed leasing agreements, pursuant to the Intercreditor Agreement, with Republic and, pursuant to them, leasing metals to Republic.  At the time of Republic's bankruptcy petition, Republic owed Techemet approximately $14,477,000 under Intercreditor Agreement metals leases.

59.     On October 31, 2017, Woodforest became a party to the Intercreditor Agreement and executed credit facilities with Republic.  It was a requirement of the credit facilities that Republic deliver copies of its audited financial statements to Woodforest within 150 days of the fiscal year end.

60.     Woodforest received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statements in entering into Intercreditor credit facilities with Republic and in loaning money to Republic pursuant to those facilities.  At the time of Republic's bankruptcy petition, Republic owed Woodforest approximately $13,648,000 under Intercreditor Agreement loans.

61.     On October 31, 2017, Leumi became a party to the Intercreditor Agreement and entered into Intercreditor credit facilities with Republic.  It was a requirement of the credit facilities that Republic deliver copies of financial statements to Leumi within 150 days of the fiscal year end.

62.     Leumi received, reviewed, and relied on Eisner's audit of Republic's 2016 financial statements in entering into Intercreditor credit facilities with Republic and in loaning money to Republic pursuant to those facilities.  At the time of Republic's bankruptcy petition, Republic

17

owed Leumi approximately $22,746,000 under Intercreditor Agreement loans.

**Eisner's Duties to The Lenders**

63.      As Republic's auditor, Eisner knew that Republic depended on the Intercreditor facilities described above, and that Republic would be providing Republic's audited financial statements to the Lenders.

64.      The 2016 audited financial statements note that "In February 2016, the Company and various creditors entered into the Second Amended and Restated Intercreditor Agreement including notes payable and metal leases" and that "the agreement has been amended and certain information on outstanding balances is included below."  The financial statements proceed to note the terms of various loans with origination dates of November 15, 2014, January 29, 2016, and May 26, 2016, to represent that Republic was in  compliance with various financial covenants applicable to these credit facilities, to describe Republic's metals leases with multiple "financial institutions," and to represent the total amount of Republic's borrowings as of December 31, 2016. The audited financial statements also summarize the Intercreditor Agreement's borrowing base and the associated limitations on Republic's total borrowings.  Specifically, the 2016 audited financial statements note that "The Company's borrowings under its agreements with the financial institutions are subject to a borrowing base.  Total borrowings cannot exceed 90% of the market value of its inventory and advances, or 90% of its accounts receivable."

65.      Given Eisner's knowledge of the Intercreditor Agreement and related loans and leases and their terms, Eisner knew and expected that Republic would share the audited financial statements with the Lenders and that the Lenders were relying on them in making lending decisions.

66.      Indeed, Eisner had direct communications with the Lenders, including to confirm

information for purposes of the audit and to substantiate its qualifications and experience to serve at Republic's auditor.

67.    Because of Eisner's knowledge concerning the Lenders and their reliance on the audited financial statements, Eisner had a duty of care to the Lenders, which it breached in issuing a clean audit for the financial statements described above.

**Republic's Bankruptcy**

68.    Republic never issued audited financial statements for 2017, and the reduction in inventory value ultimately led to Republic's default under its agreements with the Lenders and to Republic's bankruptcy.

69.    Republic and certain of its affiliates filed voluntary petitions for bankruptcy relief on November 2, 2018.  At the time of the petition, Republic owed more than $177 million to the Lenders who had relied on Eisner's audits.

**COUNT I**
*Negligent Misrepresentation*

70.    Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 69 as though set forth here in full.

71.    Eisner issued an audit report for Republic's financial statements for 2016 that falsely represented Republic's financial condition, including the value of Republic's inventory. These misrepresentations were material to Republic's financial condition and to persons relying on the audited financial statements.

72.    Eisner should have known that the inventory valuation was false, and Eisner failed to exercise reasonable care and to conduct reasonable inquiries, as would be expected of an independent auditor under the circumstances, to ensure that the valuation was reasonably accurate.

73.    Eisner knew that Republic would transmit the 2016 audited financial statements to

the creditors in general and, specifically, to the Lenders, and Eisner thus expected and intended that the audited financial statements would reach and would influence such financial institutions and precious metals lessors.  Eisner's understanding of the Lenders' reliance on the audited financial statements is further evidenced by its written communications with Republic concerning the Lenders, and its written communications directly with the Lenders.

74.     The Lenders received and justifiably relied on Republic's 2016 audited financial statements.

75.     The Lenders relied on the misrepresentations in the 2016 financial statements to their detriment in lending money and leasing metal to Republic based on materially false representations of Republic's financial condition and its compliance with covenants.  But for the misrepresentations of Republic's financial condition in the audited 2016 financial statements, the Lenders would not have extended these loans and leases to Republic and would have terminated any outstanding loans or leases.

76.     As a result of the Lenders' reliance on the audited financial statements, Plaintiffs have been injured in an amount in excess of $61.5 million.

## COUNT II
### *Gross Negligence*

77.     Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 76 as though set forth here in full.

78.     Eisner's negligence was so extreme that it constituted a reckless indifference to the rights of others and, particularly, the Lenders, who loaned and leased millions of dollars and precious metals in reliance on the accuracy and validity of Republic's audited financial statements.

79.     Eisner knew that the Lenders, who were extending credit to Republic based on a "borrowing base," for which inventory was a major component, would be relying on Republic's

audited financials.

80.     Eisner's reckless indifference included, among other grossly negligent acts and omissions, its issuance of a clean audit opinion for Republic's 2016 financial statements without making any reasonable or discernable effort to assure that Republic had fairly and accurately valued the largest and most material asset on its balance sheet, the inventory, or that Republic had adequate internal controls to assure the accuracy of management's accounting for inventory.

81.     Eisner's reckless indifference also included, among other grossly negligent acts and omissions, its failure to obtain a basic understanding of Republic's business and the precious metals refining industry before taking on an audit assignment.

82.     The Lenders justifiably relied on Eisner's audit of Republic's financial statements in agreeing to extend credit to Republic and to do so on a secured lending basis.

83.     As a result of the Lenders' reliance on the audited financial statements, Plaintiffs have been injured in an amount in excess of $61.5 million.

## COUNT III
*Fraud*

84.     Plaintiffs reallege and incorporate each of the allegations set forth in ¶¶ 1 through 83 as though set forth here in full.

85.     Eisner's clean audit opinion of Republic Metals 2016 financial statements (*i.e.*, that the financial statements present fairly, in all material respects, the financial position of Republic as of December 31, 2016) was a false statement in that Eisner's opinion included the representation that it had conducted its audit procedures in accordance with GAAS when it knew that it had not. The audit opinion was also false in that Eisner claimed that "the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion."

86.     Eisner acted recklessly in issuing its audit opinion for Republic. Eisner's auditing

practices were so deficient that the audit amounted to no audit at all. It failed to test the single largest item on Republic's balance sheet: current inventory. It took no steps to verify the quantities, weights, and contents of the hydroxide barrels. It unquestionably accepted Republic's methodology for valuing the inventory, without understanding the calculation, much less testing its validity. It also observed but failed to react to clear indications that Republic's methods were utterly and obviously deficient, including the very data that Republic's CFO, Comite, had supplied to Eisner to derive its current inventory valuations. Eisner also knew that Republic claimed to possess in these 1,973 hydroxide drums nearly 7 million ounces of silver and 15.5 thousand ounces of gold, which together would weigh about 437,500 pounds. That translates into 221 pounds of precious metal per drum. It would have been clear and obvious to Eisner that drums filled with *byproducts* from the refining process could not possibly contains such massive quantities of precious metals. Nor is it feasible that such quantities of precious-metal-rich byproduct could be generated within the regular yearly business cycle, raising significant questions about when these byproducts were generated and why they were being classified as *current* assets.

87.     Eisner knew that the Lenders, who were extending credit to Republic based on a "borrowing base," for which inventory was a major component, would be relying on Republic's audited financials and the fact that Republic's financials were being audited.

88.     The Lenders, who loaned and leased millions of dollars and precious metals, reasonably and justifiably relied on the accuracy and validity of Republic's audited financial statements and on the assurance that an auditor, here Eisner, was auditing their borrower, Republic, in accordance with GAAS.

89.     The Lenders justifiably relied on Eisner's audit of Republic's financial statements in agreeing to extend credit to Republic and to do so on a secured lending basis.

90.    But for Eisner's false statements, the Lenders would not have loaned money, leased metals, or extended existing credit facilities to Republic. Eisner's false statements proximately caused the Lenders' losses.

91.    As a result of the Lenders' reliance on the audited financial statements, Plaintiffs have been damaged in an amount in excess of $61.5 million.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request judgment on their Complaint as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be determined at trial.

B.    Awarding Plaintiffs such other or additional relief as the Court finds to be just and proper.

Dated: April 3, 2020                    Respectfully Submitted

Andrew T. Solomon
SOLOMON & CRAMER LLP
1441 Broadway, Ste. 6026
New York, New York 10018
(t) 212-884-9102
(f) 516-368-3896
asolomon@solomoncramer.com

And

SCOTT JAY FEDER, P.A.
4649 Ponce de Leon Blvd., Ste. 402
Coral Gables, Florida 33146
(t) 305-669-0060
(f) 305-669-4220
Scottj8@aol.com
assistantscottjfeder@hotmail.com

*Attorneys for Plaintiffs*